IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| QUENTIN L. SASSER,<br><br>Plaintiff,<br><br>v.<br><br>SALT LAKE CITY CORPORATION, a Utah municipal corporation; DAVID TERRY, in his individual capacity; and LYNN LANDGREN in his individual and official capacity,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER**<br>- **GRANTING [42] DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br>- **MOOTING [41] PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Case No. 2:15-CV-00606-DN<br><br>District Judge David Nuffer |

Plaintiff Quentin L. Sasser ("Mr. Sasser"), an African-American male, worked as a long-time seasonal employee at municipal golf courses run by Defendant Salt Lake City Corporation ("the City"). Former[1] Defendant David Terry ("Mr. Terry") served as the Golf Program Director for the City and Former Defendant Lynn Landgren ("Mr. Landgren") was the Head Professional at the Wingpointe Golf Course ("Wingpointe"). In the spring of 2011, Mr. Sasser applied for a permanent position as the First Assistant Professional ("the Position") at the City-run Mountain Dell Golf Course. Mr. Terry and Mr. Landgren sat on the hiring committee. Mr. Sasser was not invited to interview for the Position, and the Position was eventually filled by another City employee.

---

[1] Plaintiff's amended complaint contained only one cause of action against David Terry and Lynn Landgren in their individual capacities. Amended Complaint at ¶¶ 56–61, docket no. 27, filed April 12, 2017. That claim was dismissed, and Mr. Terry and Landgren were dismissed from the case, in the Memorandum Decision and Order Granting Defendants' Motion to Dismiss. *See* Memorandum Decision and Order Granting Defendants' Motion to Dismiss at p. 12, docket no. 52, filed December 1, 2017.

Mr. Sasser's complaint ("Complaint")[2] alleges that the City's refusal to promote Mr. Sasser represents discrimination on the basis of race and color in violation of Title VII of the Civil Rights act of 1964, 42 U.S.C. § 2000e-5,[3] and discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq.[4] The City moves for summary judgment on the racial and age discrimination claims ("Motion").[5] Mr. Sasser responded only partially to the Motion.[6] The City replies in support.[7]

Defendant's Motion for Summary Judgment is GRANTED because Mr. Sasser concedes that summary judgment on the age discrimination claim is appropriate[8] and because he fails to raise a genuine issue of material fact for his racial discrimination claim.

---

[2] Amended Complaint, docket no. 27, filed April 12, 2017.

[3] *Id.* at ¶¶ 48–50.

[4] *Id.* at ¶¶ 51–55.

[5] Defendants' Motion and Memorandum in Support of Motion for Summary Judgment, docket no. 42, filed July 11, 2017.

[6] Plaintiff's Opposition to Defendant's Motion for Summary Judgement ("Opposition"), docket no. 45, filed August 10, 2017.

[7] Defendants' Reply Memorandum in Support of Motion for Summary Judgment ("Reply"), docket no. 50, filed September 6, 2017.

[8] Opposition at p. ii, n. 1. ("Mr. Sasser concedes dismissal of his Second Cause of Action in his Amended Complaint for age discrimination claim. Thus, this Memorandum opposes only the dismissal of his race/color discrimination claim.").

**Table of Contents**

SUMMARY JUDGMENT STANDARD ................................................................................ 3
UNDISPUTED MATERIAL FACTS ................................................................................... 4
DISCUSSSION ..................................................................................................................... 11
    1.    Mr. Sasser Has Evidence of a Prima Facie Case. ................................. 12
    2.    The City Has Articulated Legitimate Nondiscriminatory Reasons for Its Employment Action. ........................................................................... 13
    3.    Mr. Sasser Has Failed to Proffer Evidence That the City's Reasons are Pretextual. ................................................................................................ 14
ORDER .................................................................................................................................. 18

# SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[9] A material fact is a fact that "might affect the outcome of the suit under the governing [substantive] law."[10] A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[11] In determining whether there is a genuine dispute as to material fact, the court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[12] The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[13]

---

[9] Fed. R. Civ. P. 56(a).

[10] *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (internal citation omitted).

[11] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[12] *Id.*

[13] *Id.* at 670-71.

## UNDISPUTED MATERIAL FACTS

1. Mr. Sasser was employed by the City for two separate periods: from 1993–2000 and from 2006–2012.[14]

2. On March 7, 1993, Mr. Landgren hired Mr. Sasser as a part-time seasonal "Golf Cart/Driving Range" employee at the City's Wingpointe Golf Course.[15]

3. The following year, the City rehired Mr. Sasser, this time as a part-time seasonal "Golf Starter" at Wingpointe. Mr. Sasser described this position as providing "counter help," picking up empty ball baskets from the driving range; refilling the range dispenser with golf balls; and moving golf carts.[16]

4. On January 8, 1995, the City again re-hired Mr. Sasser as a part-time seasonal Golf Starter at Wingpointe.[17]

5. Mr. Sasser held this position at Wingpointe for the next six seasons (i.e. 1995–2000).[18]

6. In late September 1995, Tammy Nakamura ("Ms. Nakamura"), the President of the Beehive Ladies Golf Association (an organization comprised primarily of Japanese-Americans) submitted a letter to the City's golf director describing an incident that occurred at Wingpointe during a tournament.[19]

---

[14] Motion at ¶ 9 at 7 (undisputed).

[15] Motion at ¶ 10 at 7; Opposition at ¶ 10 at x (Mr. Sasser does not dispute that he held this position.).

[16] Motion at ¶ 11 at 7; Opposition at ¶ 11 at x (Mr. Sasser does not dispute that he held this position and performed these duties.).

[17] Motion at ¶ 12 at 8; Opposition at ¶ 12 at x (Mr. Sasser does not dispute that he held this position.).

[18] Motion at ¶ 12 at 8; Opposition at ¶ 12 at x (Mr. Sasser does not dispute that he held this position at Wingpointe for this period of time.).

[19] Motion at ¶ 13 at 8; Opposition at ¶ 13 at xi (The evidence cited does not create a genuine dispute of material fact.).

7. Specifically, Ms. Nakamura overheard three golf starters in the clubhouse struggling with pronouncing the tournament participants' Japanese names. Ms. Nakamura offered to help with the pronunciation. One of the starters informed Ms. Nakamura that her help was not needed, contending they were doing a good job with pronunciation of the names.[20]

8. When Ms. Nakamura shrugged in reaction to the starter's response, Mr. Sasser remarked to another starter that it would be easier if the players had American names. Ms. Nakamura overheard Mr. Sasser's comment and was offended. She subsequently informed the City that she found Mr. Sasser's behavior to be "extremely inappropriate, particularly for a starter who maintains direct contact with the public."[21]

9. Mr. Sasser told Mr. Landgren about the incident.[22]

10. On August 17, 2000, Mr. Sasser resigned from his City employment to accept a position at Coral Canyon Golf Course ("Coral Canyon") in St. George, Utah.[23]

11. Mr. Sasser served as the tournament director, which he described as like a first assistant to the head professional, at Coral Canyon from August 2000 through April 2002.[24]

12. On November 1, 2006, Mr. Landgren rehired Mr. Sasser as a part-time seasonal Golf Starter at Wingpointe.[25]

---

[20] Motion at ¶ 14 at 8–9; Opposition at ¶ 14 at xi (The evidence cited does not create a genuine dispute of material fact.).

[21] Motion at ¶ 15 at 9; Opposition at ¶ 15 at xi (The evidence cited does not create a genuine dispute of material fact.).

[22] Motion at ¶ 17 at 9; Opposition at ¶ 17 at xii (Mr. Sasser does not dispute that he told Mr. Landgren about the incident. Furthermore, the evidence cited does not create a genuine dispute of material fact.).

[23] Motion at ¶ 18 at 10; Opposition at ¶ 18 at xii (Mr. Sasser does not dispute that he held this position.).

[24] Motion at ¶ 18 at 10; Opposition at ¶ 18 at xii (Mr. Sasser does not dispute that he held this position for this period of time); Reply at ¶ 18 at 17 (The City does not dispute Mr. Sasser's characterization of this position.).

[25] Motion at ¶ 19 at 10; Opposition at ¶ 19 at xiii (Mr. Sasser does not dispute that he was rehired to this position).

13. On February 25, 2007, Mr. Sasser was reclassified as a part-time seasonal "Golfer Relations Specialist," with job responsibilities nearly identical to those of a Golf Starter.[26]

14. The City rehired Mr. Sasser the following season but as a part-time seasonal "Golf Teaching Professional."[27]

15. A Golf Teaching Professional, Mr. Sasser's primary job duties were: i) providing golf instruction for City-sponsored junior and adult group clinics, camps, and orientations; and ii) providing individual and group lessons (on personal time and in compliance with golf program policy) to interested members of the public.[28]

16. While Golf Teaching Professionals might assist on an as-needed basis in the pro shop, the position's focus is—as its title implies—on teaching, and the job responsibilities are quite different from those of Golf Starter or Golfer Relations Specialist.[29]

17. During the 2008 and 2009 seasons, Mr. Sasser worked as a part-time seasonal Golf Teaching Professional at the City's Wingpointe and Nibley Park Golf Courses.[30]

18. At Nibley Park, Mr. Sasser taught golf lessons to children as part of the City's Junior Golf program. Mr. Sasser also performed maintenance work on the grounds crew at Wingpointe during this same time period.[31]

---

[26] Motion at ¶ 19 at 10–11; Opposition at ¶ 19 at xiii (Mr. Sasser does not dispute that his position was reclassified to this position and performed the described duties).

[27] Motion at ¶ 19 at 10; Opposition at ¶ 19 at xiii (Mr. Sasser does not dispute that his position was reclassified to this position and performed the described duties).

[28] Motion at ¶ 20 at 11; Opposition at ¶ 20 at xiv (The evidence cited does not create a genuine dispute of material fact).

[29] Motion at ¶ 21 at 11; Opposition at ¶ 21 at xiv (Mr. Sasser does not cite to any evidence in response).

[30] Motion at ¶ 22 at 11 (undisputed).

[31] *Id.* (undisputed).

19. On March 29, 2010, Mr. Sasser applied for, and was hired for, a part-time seasonal position of Golf Groundskeeper.[32]

20. As a Golf Groundskeeper, Mr. Sasser's duties included performing maintenance work, including maintaining grounds, gardens, equipment, or buildings on golf courses.[33]

21. Mr. Sasser continued to teach at Nibley Park while also serving as a Golf Groundskeeper.[34]

22. During the 2010 and 2011 seasons, Mr. Sasser retained his employment as a Golf Groundskeeper and continued to teach at Nibley Park.[35]

23. On February 4, 2011, Mr. Sasser applied for an Assistant Professional position with the City.[36]

24. The Assistant Professional position is the second-highest-ranking employee at a City golf course. The Position's job summary stated that the Assistant Professional "Assists Golf Club Professional in managing course play, practice range and pro shop operations for a Salt Lake City municipal golf course. Provides administrative backup in the Golf Club Professional's absence. Gives golf lessons and instructions. Advises the professional on problems and suggestions for improvement."[37]

25. The Position's job description outlined that the typical duties of an Assistant Professional included being responsible for "[a]ssisting in the day-today management of [a]

---

[32] Motion at ¶ 23 at 11 (undisputed).

[33] *Id.* (undisputed).

[34] *Id.* (undisputed).

[35] Motion at ¶ 24 at 11; Opposition at ¶ 24 at xvi (The evidence cited does not create a genuine dispute of material fact.).

[36] Motion at ¶ 1 at 5 (undisputed).

[37] Motion at ¶ 2 at 5; Opposition at ¶ 2 at v–vi (providing the complete and undisputed job summary).

municipal golf course," including "managing course play, practice range[,] and pro shop operations." The typical duties also include "preserving order in and around [the] pro shop premises," "giv[ing] golf lessons and instructions," "assist[ing] [the head professional] in scheduling play and administering City-sponsored tournaments," keep[ing] golf carts clean," "keep[ing] [the] driving range in working order," and "coordinat[ing] with golf course maintenance . . . in monitoring [the] condition of the golf course."[38]

26. When evaluating job applicants for Assistant Professional positions, the City placed significant emphasis on the following key areas: providing quality customer service to the golfing public; merchandising and handling pro shop inventory; operating a computerized point-of-sale system; and organizing and running group golf events (such as leagues, associations, and tournaments).[39]

27. In Mr. Sasser's online application, he referenced only two previous jobs (none prior to 2002): his maintenance and teaching positions.[40]

28. First, he indicated that, from October 27, 2002 through October 30, 2006, he worked as a part-time employee on the maintenance crew at Fore Lakes Golf Course, where his job duties consisted of "[a]ssist[ing] with maintenance of the golf course" and teaching "[p]rivate and individual lessons, [j]unior golf clinics[,] and camp." Second, he noted that, from November 28, 2006 onward, he served as a part-time employee on the maintenance crew at Wingpointe and described his job duties there as being identical to those at Fore Lakes.[41]

---

[38] Motion at ¶ 3 at 5; Opposition at ¶ 3 at vi (providing the complete and undisputed typical duties).

[39] Motion at ¶ 5 at 5–6; Opposition at ¶ 5 at vii (Mr. Sasser does not cite to any evidence in response and offers legal argument prohibited by DUCivR 56-1.).

[40] Motion at ¶ 27 at 13; Opposition at ¶ 27 at xvi (The evidence cited does not create a genuine dispute of material fact.).

[41] Motion at ¶ 28 at 13–14; Opposition at ¶ 28 at xvi–xvii (The evidence cited does not create a genuine dispute of material fact.).

8

29. The City received a total of 28 applications for the Position. Of those 28 applications, five applications (including Mr. Sasser's) did not include a resume along with their online application.[42]

30. The hiring committee for the Position consisted of the following four individuals: David Terry, Lynn Landgren, Mike Brimley, and Derek Schmehl. As the first step in the hiring process, the four committee members each independently reviewed the application materials submitted and provided their individual lists of the top ten candidates. The purpose of conducting this initial ranking was to select approximately eight candidates for interviews.[43]

31. Mr. Terry ranked Mr. Sasser tenth. Mr. Landgren, Mr. Brimley, or Mr. Schmehl did not rank Sasser in their top ten candidates. Consequently, Mr. Sasser was not selected for an interview for the Position.[44]

32. Mr. Landgren indicated he did not rank Mr. Sasser in his top ten because he thought there were more-qualified candidates. Mr. Landgren also questioned Mr. Sasser's customer service skills, noting that, based on his experience working with him, Mr. Sasser "sometimes . . . comes over a little hard to people" and "[a] little rough," which, in Mr. Landgren's estimation, was not ideal for an Assistant Professional.[45]

---

[42] Motion at ¶ 29 at 14; Opposition at ¶ 29 at xvii (The evidence cited does not create a genuine dispute of material fact.).

[43] Motion at ¶ 30 at 14; Opposition at ¶ 30 at xvii (The evidence cited does not create a genuine dispute of material fact.).

[44] Motion at ¶ 31 at 14; Opposition at ¶ 31 at xvii–xviii (The evidence cited does not support Mr. Sasser's asserted fact nor does it create a genuine dispute of material fact.).

[45] Motion at ¶ 32 at 15; Opposition at ¶ 32 at xviii (The evidence cited does not create a genuine dispute of material fact.).

33. While Mr. Brimley indicated Mr. Sasser was a "good player" and "good teacher," he believed Mr. Sasser lacked sufficient knowledge of computerized point-of-sale systems and tournament software to rank as one of his top ten candidates.[46]

34. With respect to Mr. Schmehl, he did not rank Mr. Sasser in his top ten because he had been informed to only consider the written application materials. Mr. Sasser's application solely referenced maintenance work and teaching Junior Golf, which were not key job responsibilities of an Assistant Professional.[47]

35. Mr. Schmehl would have selected Mr. Sasser for an interview if he could have reviewed Mr. Sasser's resume.[48]

36. The City ultimately selected Jeremy Miller ("Mr. Miller"), who had continuously worked for the City since 2006 as a part-time seasonal Golf Starter and Golfer Relations Specialist, for the Assistant Professional position.[49]

37. Although Mr. Miller's resume was not included with his online application, Mr. Terry communicated to Mr. Miller that his resume was not included in his online application.[50]

---

[46] Motion at ¶ 33 at 15; Opposition at ¶ 33 at xix (Mr. Sasser does not dispute what Mr. Brimley stated. Furthermore, the evidence cited does not create a genuine dispute of material fact.).

[47] Motion at ¶ 34 at 15; Opposition at ¶ 34 at xix (providing citation to the deposition of Mr. Schmehl in which he detailed the instructions he received before reviewing applications); Reply at ¶ 34 at 30 (The City does not respond to the citation to the deposition.).

[48] Opposition at ¶ 34 at xix (providing citation to the deposition of Mr. Schmehl in which he offered that he would have wanted to interview Mr. Sasser based on his knowledge of Mr. Sasser's background); Reply at ¶ 34 at 30 (The City does not dispute that Mr. Schmehl said this.).

[49] Motion at ¶ 35 at 15; Opposition at ¶ 35 at xix–xx (Mr. Sasser does not dispute that Mr. Miller was selected.).

[50] Motion at ¶ 35 at 15–16; Opposition at ¶ 35 at xix–xx (providing the citation to the deposition of Mr. Terry that he informed Mr. Miller that his resume was not included with his application); Reply at ¶ 35 at 29–30 (The city does not dispute that Mr. Terry contacted Mr. Miller.).

38. Mr. Miler submitted a hard copy resume to the City's Human Resources Department, which was included in the application materials and reviewed by the four members of the hiring committee in the course of conducting their initial ranking.[51]

39. Three of the four members of the hiring committee were aware that Mr. Miller, although a part-time seasonal employee, had voluntarily assumed many of the Assistant Professional duties at Nibley Park following the resignation of that course's Assistant Professional.[52]

40. Among the nine candidates who were interviewed for the Assistant Professional position, Mr. Miller scored the highest in the interview portion of the process.[53]

41. The City does not have Mr. Miller's resume in his personnel file, nor could it produce it with the other applications materials.[54]

## DISCUSSSION

Under the three-step allocation of burdens of proof mandated by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*,[55] a plaintiff bringing a failure-to-promote claim under Title VII must initially establish a prima facie case demonstrating that: 1) the plaintiff was a member of a protected class; 2) the plaintiff applied for and was qualified for the position; 3) despite being qualified the plaintiff was rejected; and 4) after the plaintiff was

---

[51] Motion at ¶ 35 at 15–16; Opposition at ¶ 35 at xix–xx (Mr. Sasser does not dispute that Mr. Miller submitted a hard copy of his resume.).

[52] Motion at ¶ 36 at 16; Opposition at ¶ 36 at xx (The evidence cited does not create a genuine dispute of material fact.).

[53] Motion at ¶ 37 at 16; Opposition at ¶ 37 at xx (The evidence cited does not create a genuine dispute of material fact.).

[54] Opposition at ¶ 11 at v (undisputed).

[55] 411 U.S. 792, 801–803 (1973).

rejected, the position was filled.[56] If the plaintiff successfully establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its employment action.[57] That successful showing would then shift the burden back to the plaintiff to proffer evidence that the employer's reason is pretextual.[58]

The City argues summary judgment is appropriate on Mr. Sasser's claim of racial discrimination for two reasons:[59] 1) Mr. Sasser cannot present a prima facie case of race and color discrimination because he cannot demonstrate that he was qualified for the Position;[60] and 2) Mr. Sasser does not have any evidence showing that the City's legitimate, nondiscriminatory reasons for its employment decisions are pretextual.[61] Although Mr. Sasser can demonstrate a prima facie case, the City is correct that Mr. Sasser cannot demonstrate pretext. Therefore, summary judgment for the City is appropriate.

### 1. Mr. Sasser Has Evidence of a Prima Facie Case.

No issue is presented at the first step of the *McDonnell Douglas* analysis because the City only argues that Mr. Sasser lacked the required qualifications for the Position, especially when compared to other candidates such as Mr. Miller.[62] This argument attempts to rebut Mr. Sasser's claim that he was qualified (which is part of his prima facie case) and also support the City's

---

[56] *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1226 (10th Cir. 2000).

[57] *Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1216 (10th Cir. 2002).

[58] *Id.*

[59] The City also argued that Mr. Sasser is procedurally time-barred from bringing his Title VII claim due to his alleged failure to file a charge of discrimination within 300 days of the purported adverse employment action. Motion at 2. However, the City did not comply with DUCivR 56-1 and include in its statement of elements and undisputed facts any facts (with relevant citation) as to Mr. Sasser's timeliness in filing a charge of discrimination. *See* Motion at pp. 3–17. The City first introduces a supporting fact relevant to timeliness three pages into its argument section. Motion at 20 n. 96. Because the City failed to comply with DUCivR 56-1, only the undisputed facts and accompanying argument addressing the racial discrimination claim may be considered.

[60] Motion at 2.

[61] *Id.*

[62] Motion at 22.

proffered nondiscriminatory reason behind its decision not to interview or promote Mrs. Sasser. This is not permitted. A "defendant may not 'short circuit' the *McDonnell Douglas* analysis by challenging plaintiff's qualifications at the prima facie stage."[63] "[T]he [defendant's] evidence is properly considered in addressing whether those articulated reasons are legitimate or merely a pretext for discrimination."[64] This sequence preserves the opportunity for a plaintiff "to show that the reasons advanced by the defendant were pretextual."[65] When a defendant asserts a plaintiff's lack of qualifications, "the court need only conclude at the prima facie stage that the plaintiff has shown through credible evidence, including [his] own testimony, that [he] was minimally qualified for the position [he] sought, even if the defendant disputes that evidence."[66]

By challenging Mr. Sasser's qualifications at the prima facie stage, the City attempts to resolve the factual issue of qualifications at the first *McDonnell Douglas* step. But the undisputed facts regarding Mr. Sasser's years of seasonal employment with the City[67] show that he was, at the very least, minimally qualified for the Position. The analysis will continue to the next *McDonnell Douglas* step.

### 2. The City Has Articulated Legitimate Nondiscriminatory Reasons for Its Employment Action.

In the Tenth Circuit, "if a plaintiff establishes a prima facie case [of discrimination], the burden of going forward shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions."[68] "Step two only requires that the defendant explain its actions against the

---

[63] *Stahl v. Bd. of Comm'rs of Unified Gov't of Wyandotte Cty./Kansas City, Kansas*, 244 F. Supp. 2d 1181, 1187 (D. Kan. 2003)(citing *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1316 n. 11 (10th Cir.1999)).

[64] *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1470 (10th Cir. 1992).

[65] *E.E.O.C. v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184, 1193 (10th Cir. 2000).

[66] *Stahl*, 244 F. Supp. 2d at 1187.

[67] *See* Undisputed Material Facts ¶¶ 1–5, 10–22.

[68] *Adamson v. Multi Community Diversified Services, Inc.*, 514 F.3d 1136, 1145 (10th Cir. 2008).

plaintiff in terms that are not facially prohibited by Title VII."[69] "[T]he defendant does not . . . need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion."[70]

The undisputed facts here demonstrate that the City declined to interview or hire Mr. Sasser for the Position because the members of the hiring committee thought that there were more qualified candidates;[71] past experience caused the committee to question Mr. Sasser's customer service skills;[72] the committee did not think that Mr. Sasser had sufficient knowledge of point of sale systems or other software;[73] and Mr. Sasser 's experience in the two jobs he listed in his applications was not applicable to the Position.[74] None of these reasons are facially prohibited by Title VII.[75] The City has carried its burden at the second stage under *McDonnell Douglas*, and the burden shifts back to Mr. Sasser.

### 3. Mr. Sasser Has Failed to Proffer Evidence That the City's Reasons are Pretextual.

In the final step of the *McDonnell Douglas* analysis, "mere conjecture that [an] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."[76] A plaintiff may establish pretext by showing "such weaknesses, implausibility, inconsistencies, incoherencies, or contradictions in the employer's proffered

---

[69] *E.E.O.C. v. Flasher Co.*, 986 F.2d 1312, 1317 (10th Cir. 1992).

[70] *Id*. at 1316.

[71] Undisputed Material Facts ¶ 32.

[72] *Id.*

[73] *Id.* at ¶ 33.

[74] *Id.* at ¶ 34.

[75] *See* 42 U.S.C. § 2000e-2(a).

[76] *Branson v. Price River Coal Co*., 853 F.2d 768, 772 (10th Cir. 1988).

legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[77] However, "[i]n determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision[,] not the plaintiff's subjective evaluation of the situation."[78] Therefore, "[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[79]

Mr. Sasser makes numerous attempts to demonstrate weakness and implausibilites in the City's proffered reasons, but none of these arguments meet his burden because they 1) lack evidentiary support; 2) depend on Mr. Sasser's subjective evaluation of the hiring decision; or 3) fail to demonstrate that the City acted in bad faith.

First, Mr. Sasser argues he can show pretext because of the multiple reasons offered for not interviewing him (instead of a "unified reason") and because the hiring committee misjudged his past performance and qualifications.[80] This argument is a subjective evaluation of the City's hiring process, particularly due to the undisputed fact that his online application only listed two previous jobs.[81]

Next, Mr. Sasser offers that the City's failure to produce Mr. Miller's resume or to substantiate the City's assertion that Mr. Miller had prior experience running a golf course is

---

[77] *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997) (quoting *Olson v. Gen. Elec. Astrospace*, 101 F.3d 947, 951–52 (3d Cir. 1996)).

[78] *Lobato v. New Mexico Env't Dep't,* 733 F.3d 1283, 1289 (10th Cir. 2013).

[79] *Id.*

[80] Opposition at 11–12.

[81] Undisputed Material Facts ¶¶ 27–28.

evidence of pretext.[82] In light of the undisputed fact that three of the four members of the hiring committee were already aware that Mr. Miller had voluntarily assumed some of the Assistant Professional duties at Nibley Park,[83] this argument fails to show that the City did not act in good faith on an honest belief.

Mr. Sasser's third argument that he has shown evidence of pretext is that his performance was more intensely scrutinized compared to that of other employees.[84] But this is unsupported by citation to fact.[85]

His fourth argument that his qualifications were superior to Mr. Miller's[86] is another argument based entirely Mr. Sasser's subjective evaluation of the City's hiring process.

His fifth argument, that Mr. Miller was judged more favorably despite more recent disciplinary history and customer complaints lodged against him,[87] is yet another subjective evaluation.[88] Mr. Sasser attempts to support this argument with the unsupported (and conclusory) assertion that Mr. Landgren kept a secret employee file on Mr. Sassser because of his race.[89]

---

[82] Opposition at 12.

[83] Undisputed Material Facts ¶ 39.

[84] Opposition at 12.

[85] *See* Opposition at 12 n. 123. Mr. Sasser cites to case law rather than fact.

[86] Opposition at 12.

[87] Opposition at 12.

[88] Mr. Sasser's assertion that Mr. Miller had this history of discipline and complaints is supported by a citation to the Terry Deposition attached as Exhibit 7 to the Opposition. *See* Opposition at 12 n. 125. However, Mr. Sasser has also failed to comply with [DUCivR 56-1](DUCivR 56-1). This fact, and its accompanying citation, first appears in Mr. Sasser's opposition argument. It does not appear in either Mr. Sasser's responses to the City's material facts or his own statement of additional material facts.

[89] Opposition at 12. The citation provided with this argument again references case law and not fact. *See* Opposition at 12 n. 126. Furthermore, the only time that Mr. Sasser provides an accurate citation to his assertion that Mr. Landgren kept a file on Mr. Sasser (separate from Mr. Sasser's personnel folder) is in response to a fact that is immaterial to the argument that the 2011 hiring decision was motivated by race. *See* Opposition at ¶ 25 at xv (addressing Mr. Sasser's 2007 application for an Assistant Professional position–an application that Mr. Sasser completely ignores in the argument section of his Opposition). Mr. Sasser does not include this fact in his statement of additional material facts. *See* Opposition at ¶ 1 at iii–¶ 11 at v. Any other reference to this file, or more specifically that Mr. Landgren shared its contents with other individuals, is either unaccompanied by citation or wholly unsupported by the cited deposition testimony. *See* Opposition at ¶ 17 at xii (reference to file unaccompanied

Sixth, Mr. Sasser's argument that some of the reasons offered for not interviewing him are pretextual because they are a "sham"[90] is, yet again, subjective and unsupported by evidence.

Finally, Mr. Sasser argues that he can show pretext because Mr. Terry deviated from protocol when he asked Mr. Miller to submit his missing resume.[91] This does not show bad faith. "Title VII is not violated by the exercise of erroneous or even illogical business judgment."[92] This is because "[a]n employer's business judgment is relevant only insofar as it relates to the motivation of the employer with respect to the allegedly illegal conduct."[93] The undisputed facts show that the majority of the hiring committee knew about Mr. Miller and his experience at Nibley Park.[94] Mr. Terry's choice to contact Mr. Miller and ask him to provide his resume might not have been "wise, fair, or correct"[95] but it is not pretextual. Specifically, it does not show that the City's decision was motivated by discrimination instead of by the City's honest belief that Mr. Miller was the better choice for the Position.

---

by citation to evidence), Opposition at ¶ 31 at xvii (reference to sharing information from file unsupported by cited deposition), Opposition at ¶ 32 at xvii (reference to sharing information from file unsupported by cited deposition), Opposition at ¶ 33 at xix (reference to sharing information from file unsupported by cited deposition).

[90] Opposition at 13.

[91] *Id.*

[92] *Sanchez v. Philip Morris Inc.*, 992 F.2d 244, 247 (10th Cir. 1993).

[93] *Id.*

[94] Undisputed Material Facts at ¶ 39.

[95] *Lobato*, 733 F.3d at 1289.

## ORDER

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment[96] is GRANTED.

IT IS FURTHER ORDERED that by granting Defendants' Motion for Summary Judgment,[97] The Plaintiff's Motion for Partial Summary Judgment on Title VII Claim[98] is MOOT.

The clerk of the court is directed to close this case.

Signed December 1, 2017.

BY THE COURT

David Nuffer
United States District Judge

---

[96] Defendants' Motion and Memorandum in Support of Motion for Summary Judgment, docket no. 42, filed July 11, 2017.

[97] *Id.*

[98] Plaintiff's Motion for Partial Summary Judgment on Title VII Claim and Memorandum in Support, docket no. 41, filed July 11, 2017.